UNITED STATES BANKRUPTCY COURT
DISTRICT OF SOUTH DAKOTA

| | | |
|---|---|---|
| In re: | ) | Bankr. No. 06-10119 |
| | ) | Chapter 7 |
| JAMES WRIGHT PORTER, | ) | |
| a/k/a Jim Porter, | ) | |
| a/k/a James Porter, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| FORREST C. ALLRED, TRUSTEE, | ) | Adv. No. 07-1012 |
| | ) | |
| Plaintiff, | ) | |
| | ) | DECISION RE: TRUSTEE-PLAINTIFF'S |
| -vs- | ) | COMPLAINT TO AVOID CERTAIN |
| | ) | TRANSFERS FOR THE BENEFIT |
| BEVERLY A. PORTER and | ) | OF THE BANKRUPTCY ESTATE |
| ATLANTIC AUTO GROUP, INC. | ) | AND FOR IMPOSITION OF |
| | ) | A CONSTRUCTIVE TRUST |
| Defendants. | ) | |

The matter before the Court is Trustee-Plaintiff Forrest C. Allred's complaint against Defendants Beverly A. Porter and Atlantic Auto Group, Inc. seeking a determination of whether the transfer of certain assets should be avoided for the benefit of the bankruptcy estate and whether a constructive trust should be placed on certain other assets. This is a core proceeding under 28 U.S.C. § 157(b)(2). These findings and conclusions are entered pursuant to Fed.R.Bankr.P. 7052. As set forth below, a judgment will be entered avoiding Debtor James Wright Porter's transfer of his interest in a lake home in Day County, South Dakota to Defendant Beverly A. Porter.

**Findings of Fact**.

James Wright Porter ("James Porter") was the sole shareholder and principal officer of an auto sales business in Webster, South Dakota. The business was first known as Porter Auto Sales, Inc. When it later expanded to include boat sales, it became known as Porter Auto and Marine, Inc. ("Porter Auto"). Porter Auto was James Porter's sole source of income. Consequently, his income fluctuated, depending on how successful the business was in a given year. A financial statement dated July 21, 2000 indicated his income that year was $48,000.00.

James Porter's wife, Beverly A. Porter ("Beverly Porter"), taught elementary school for many years.  Her income as a teacher is unknown.  She was not actively involved in Porter Auto.  Her participation was limited to attending auto auctions with James Porter and occasionally helping him pick up and deliver vehicles.  She did not bid on vehicles, do any bookkeeping, or have any familiarity with the operations of Porter Auto.[1]

In the early 1990s, James Porter and Beverly Porter (collectively, the "Porters") purchased a townhouse in Jupiter, Florida.  They made the mortgage payments from a joint account to which they both contributed funds.  A few years later, they sold that townhouse and purchased another home on Fairway Drive in a Florida development called "The Estuary."

The Porters purchased an unimproved lot on Pickerel Lake in Day County, South Dakota on August  22, 2000.  The deed was recorded that day.  The Porters took title as joint tenants with right of survivorship.  The Porters first built a garage on the lot and later built a home ("lake home") on it.[2]

On October 4, 2000, the Porters purchased some additional lake property in Day County ("lake lots").[3]  The Porters took title as joint tenants with right of survivorship.

---

[1] Beverly Porter signed a note with the Small Business Administration as the corporate secretary on February 9, 1999.  Her lack of any meaningful involvement in Porter Auto, however, was established by her and her husband's trial testimony. There was no evidence to the contrary.

[2] This lake home's legal description is:

Lot 4, Jewett's Pickerel Lake Subdivision of Government Lot 2 and Government Lot 3 in Section 27, Township 124 North of Range 53 West of the 5th P.M., Day County, South Dakota.

(The complaint in this adversary proceeding described the range number as 64.)

[3] The lake lots' legal description is:

Lots Two, Three and Four (2, 3 and 4), Ralph Johnson's

The deed was not recorded until May 1, 2001.[4]

Beginning in 1997, James Porter and Porter Auto encountered financial problems. James Porter attributed those problems to competition from Northland Auto Center, Inc., an auto sales business opened and operated by a former employee, Nathan Johnson, and his family ("the Johnsons"). The Johnsons not only opened a competing business in the same town, they hired away several of Porter Auto's employees. James Porter eventually sued the Johnsons in state court, claiming damages of approximately $500,000.[5] The Johnsons counter-sued.[6]

On February 5, 2001, Beverly Porter incorporated Atlantic Auto Group, Inc. ("Atlantic Auto") in Florida with a capital investment of $3,750 in cash. She was the sole shareholder.

At the trial in this adversary proceeding ("trial"), Beverly Porter stated she started Atlantic Auto because she and James Porter needed income, she did not want to teach anymore, and she did not want to work "nine to five everyday." She stated she started the business with the intention of developing townhouses for resale on the South Dakota lake lots. She acknowledged she had never incorporated a business before and had no prior experience in auto sales. Nevertheless, she believed she had

---

Subdivision of Pettie's Outlot One (1) of Lot One (1) in Section 34 in Township 124 North of Range 53 West of the Fifth Principal Meridian, Day County, South Dakota, subject to electric light and power line easement, telephone line easement and road easement of record.

[4] There were vague references in the record that suggest James Porter individually or the Porters together may have owned other lake lots at one time.

[5] Robert L. Spears, one of the attorneys representing James Porter in this state court action, thought James Porter's demand for relief was about $500,000. James Porter thought it was more.

[6] At his meeting of creditors, James Porter testified most of Porter Auto's records were stolen. He did not indicate when the theft occurred or if the matter had been reported to law enforcement. He did not state what business records he still retained.

the knowledge to start and operate an auto dealership. She said her husband, daughter, and son-in-law all had experience in the auto business. At the same time, she claimed James Porter had no role in forming Atlantic Auto. She testified her initial investment in the business came from an accumulation of cash gifts from her mother.

Beverly Porter's trial testimony about Atlantic Auto conflicted with statements she made during a September 26, 2007 deposition. During that deposition, Beverly Porter said Atlantic Auto was originally intended as her business entity to buy older homes "down there" (presumably Florida) to refurbish and sell. She further stated Atlantic Auto was just a name "we" picked, and auto sales were something they might do in the future. When deposed, Beverly Porter also stated the start up cash for Atlantic Auto came "through teaching and so forth, through my job."

According to typed minutes, Atlantic Auto's first stockholders meeting was held February 10, 2001 at the Fairway Drive property in Florida. James Porter apparently appeared in person and was elected "Chairman." Beverly Porter appeared by telephone and was elected secretary. The Porters were each elected to be one of the two directors. These minutes were signed and dated February 12, 2001 by Beverly Porter as "Stockholder."

Separate typed minutes indicate Atlantic Auto's first directors meeting was also held February 10, 2001 at the Fairway Drive property. James Porter appeared in person. Beverly Porter appeared by telephone. The directors elected James Porter president and Beverly Porter secretary and designated the Fairway Drive property as the principal office. The corporate treasurer, whom the Court was unable to identify from the record, was authorized to open a bank account. Contrary to statements in the minutes, the articles of incorporation, the formal resolution on the bank's form for the opening of the bank account, and the stock certificate form were not appended to the minutes. The corporation was authorized to issue 3,750 shares to Beverly

Porter upon delivery of "said assets," which were not further described. These minutes were signed by James Porter on February 10, 2002 [sic] and Beverly Porter on February 12, 2001.

According to typed minutes dated February 20, 2001 and signed by Beverly Porter as secretary, Atlantic Auto held a board meeting "at Pickerel Lake" in South Dakota, with the Porters both present. The minutes awkwardly state the board authorized the Porters to transfer their lake home and their lake lots to Atlantic Auto but do not identify any consideration the Porters were to receive from Atlantic Auto for that transfer. The lake lots were to be transferred "when the Contract for Deed to Kermit Parks is paid off, on or before the due date of May 1, 2001." The minutes further state Atlantic Auto would "put together plans to build townhouses and to use the [lake home and lake lots] for borrowing power to develop the townhouses." The minutes do not reflect any plans for the corporation to buy and refurbish houses in Florida or to sell vehicles. The record does not contain any transfer documents, but subsequent title reports confirm the lake lots were transferred to Atlantic Auto. The record is less clear on whether Atlantic Auto ever received title to the lake home.

On May 18, 2001, the Porters sold the Fairway Drive property and purchased a home located on Caloosahatchee Drive in Jupiter, Florida.[7] They used proceeds from

_____

[7] The legal description for this property is:

A parcel of land being all of Lot 7 and a portion of Lot 6, Block 86, JUPITER RIVER ESTATES, an ADDITION TO JUPITER, according to the plat thereof, as recorded in Plat Book 14, Page 27, Public Records, Palm Beach County, Florida; said parcel being specifically described as follows:

Begin at the Southeast corner of said Lot 7; thence, bear North 89 degrees 59'21" West, along the Southerly line of said Lots 7 and 6, a distance of 61.11 feet; thence, North 01 degrees 26'55" East, a distance of 109.00 feet to a point on the Northerly line of said Lot 6; thence, South 80 degrees 59'21" East, along the Northerly line of said Lots 6 and 7, a distance of 60.90 feet to the Northeast corner of said

the Fairway Drive property to purchase the Caloosahatchee Drive property. The Warranty Deed for the Caloosahatchee Drive property described the Porters as husband and wife and listed for both a rural route address in Grenville, South Dakota, where the lake home is located. The deed appears to have been recorded on May 21, 2001. At trial, James Porter claimed when this property was purchased, he was physically residing in Florida more than half the year, he intended to permanently live there and claim the Caloosahatchee Drive property as his homestead, and he held a Florida driver's license.

Beverly Porter retired from teaching in 2001. Initially, her annual retirement income was $22,000-$24,000, and it has increased approximately 3% each year since. She did not have any personal savings when she retired, but she did receive an early retirement bonus of $8,000 in 2002 and another $8,000 in 2003.

Porter Auto was closed by June 1, 2001. It was in default on its obligations to its secured lenders, including Dacotah Bank, its utility providers, and its trade creditors. James Porter was likewise in default on his obligations as a co-debtor or guarantor on several of those corporate debts. Beverly Porter was aware of the severe financial problems Porter Auto and her husband were experiencing.

Dacotah Bank sued James Porter and Porter Auto in state court, and on January 18, 2002, the bank obtained a judgment against them for $497,165.18. That judgment is final.

On January 14, 2002, the Small Business Administration ("SBA") commenced its own action against "Jim" Porter and Porter Auto in federal court. It sought a judgment against them for $223,351.62 plus interest.

According to its corporate minutes, Atlantic Auto held its 2002 annual meeting

---

Lot 7; thence, South 01 degrees 20'30″ West, along the Easterly line of said Lot 7, a distance of 109.00 feet to the POINT OF BEGINNING.

on February 5, 2002 at the registered agent's office in Tequesta, Florida.  At that
meeting, the Porters were re-elected as the corporation's only two directors; James
Porter was re-elected as its president; and Beverly Porter was re-elected as its
secretary.  These minutes are in the record three times.  Atlantic Auto placed two
copies into evidence, one a stand-alone document (Exhibit A-3) and the other the front
page of a collection of documents (Exhibit A-8).[8]  A third copy is among the exhibits
from Beverly Porter's deposition.  Exhibit A-3 and the copy from Beverly Porter's
deposition are the same.  All three were signed by James Porter as president and
Beverly Porter as secretary.  The copy from Exhibit A-8, however, has some structural
differences, *e.g.*, a more extensive use of ALL CAPS, and the Porters' signatures are
different.  The most notable difference, however, is the copy from Exhibit A-8 includes
an extra paragraph:

> The President called for the 2001 annual Financial Statement to be
> approved and adopted and be filed as part of the minutes.

Neither version was identified as amended minutes.

On February 12, 2002, James Porter gave Beverly Porter a quitclaim deed to
the Caloosahatchee Drive property in Florida.  The stated consideration was $10.00.
During her September 26, 2007 deposition, Beverly Porter testified James Porter
transferred his interest in the Caloosahatchee Drive property to her

> [b]ecause at that time, [James Porter] had a business deal that went bad
> and he was having some health problems.  And I was going to have to
> maintain the payments on any properties that we had.  And so we
> transferred it to my name because I was supporting him.

She also stated the transfer was made because she wanted to borrow money against

the Caloosahatchee Drive property, and James Porter did not.  She said she intended

---

[8]  Defendant Atlantic Auto's exhibits were offered into evidence at the end of
the trial with no supporting testimony.  Defendants' counsel described them as
"corporate records," and the Court accepted them as such, though several were not
signed.

to use the borrowed funds for living expenses and to operate Atlantic Auto.  She described the consideration for the transfer as her "continued" and "future" support of him.[9]

At trial, James Porter admitted he did not actually receive anything in return for his interest in the Caloosahatchee Drive property.  He also admitted he was severely in debt at the time, though he still had hopes of winning his lawsuit against the Johnsons.  He had already been found liable to Dacotah Bank for $497,165.18, had been sued by the SBA for $223,351.62 plus accruing interest, and had been counter-sued by the Johnsons.  Absent a full recovery on his claim against the Johnsons, he did not have sufficient assets to cover Dacotah Bank's judgment and the SBA's claim.

Beverly Porter likewise admitted she did not actually give James Porter anything in return for his interest in the Caloosahatchee Drive property.  She conceded the Porters did not disclose the transfer to any of James Porter's business creditors.  She admitted she knew, when he transferred his interest in the property to her, James Porter was not meeting his financial obligations.  She also admitted James Porter had full use and enjoyment of the Porters' several Florida properties, and his use and enjoyment of those properties did not change after he transferred his interest in the Caloosahatchee Drive property to her.

On March 22, 2002, Dacotah Bank commenced another state court action against James Porter and Atlantic Auto, alleging James Porter had fraudulently transferred a number of his assets.  On October 9, 2002, the SBA obtained a judgment in federal court against "Jim" Porter and Porter Auto for $223,351.62 plus accruing interest and certain costs (the date the judgment was filed is difficult to

_____

[9] During his meeting of creditors, James Porter testified the reason a Florida home he and his wife had once owned jointly (presumably the Caloosahatchee Drive property) had been placed solely in his wife's name was "[b]ecause that's what [his wife, Beverly Porter] insisted."  He could not say whether her insistence arose from a concern about his financial situation.

read).   The judgment is presumed final.

During her deposition, Beverly Porter testified she sold the Caloosahatchee Drive property in the summer of 2002 and purchased another home on Raintree Trail in Jupiter, Florida.  She estimated the Caloosahatchee Drive property sold for around $150,000.  She took title to the Raintree Trail property solely in her name.

According to typed minutes signed by both the Porters, Atlantic Auto held its 2003 annual meeting on January 13, 2003 at the Caloosahatchee Drive property in Florida.[10]  This contradicts Beverly Porter's deposition testimony that she sold the Caloosahatchee Drive property in the summer of 2002.

Undated, typed minutes signed by Beverly Porter as secretary indicate Atlantic Auto held a special meeting on August 1, 2003.  Though not identified as such, this appears to have been a directors meeting.  According to these minutes, Beverly Porter, as "owner" of Atlantic Auto, was authorized "to work with Dacotah Bank . . . to transfer *her* properties as necessary to help settle James Porter's debt to Dakota [sic] Bank [emphasis added]."  It is unclear why corporate authority was necessary for Beverly Porter to do anything with property she owned.  There were no references in the minutes related to corporate-owned property.

On August 25, 2003, James Porter, Porter Auto, and Atlantic Auto executed a written settlement agreement with Dacotah Bank to resolve the bank's earlier judgment against James Porter and Porter Auto and its then pending fraudulent transfer action against James Porter and Atlantic Auto.  Pursuant to the parties' agreement, James Porter, Porter Auto, and Atlantic Auto agreed to give Dacotah Bank $50,000 in cash on or before August 20, 2003 (a date that had already passed) and

---

[10] Defendant Atlantic Auto placed signed 2003 annual meeting minutes into evidence as a single document (Exhibit A-4) and unsigned 2003 meeting minutes into evidence as part of a collection of documents (Exhibit A-8).  The unsigned minutes indicate Beverly Porter was elected vice president and secretary/treasurer.  The signed minutes do not reference the election of a vice president or a treasurer.

transfer the lake lots and a lot in Webster, South Dakota ("Webster city lot") to Dacotah Bank.[11]  The agreement did not contemplate any transfer of the South Dakota lake home or the imposition of a mortgage on it.  The agreement was signed by James Porter individually and as president of Porter Auto, Beverly Porter as secretary/treasurer of Atlantic Auto, and the president of Dacotah Bank.

A handwritten document labeled "Amendment" and dated "1-2-04" indicates Atlantic Auto's 2004 annual meeting was held, with the Porters and Neal Noble present.[12]  These handwritten minutes state, "A motion was made by Beverly Porter and accepted by all present to remove James Porter as president."  Inserted separately at the end of this sentence was a note that said, "Change to as director."  This handwritten document further states an election of officers was held with Beverly Porter elected as president and secretary/treasurer and "Neil" [sic] Noble elected as vice-president.  The document concludes with the statement that "[i]t was agreed to apply for a used vehicle dealer license in [the] Palm Beach area of Florida."  This handwritten document was signed by Beverly Porter.

Typed minutes indicate Atlantic Auto's 2004 annual meeting was held January 12, 2004 at the Raintree Trail property in Florida, ten days after the handwritten "Amendment" described above.  According to these typed minutes, the Porters and Neal Noble were elected directors, James Porter was elected president, and Beverly Porter was elected secretary.  These minutes also indicate the business was going to apply "for a Florida Motor Vehicle Used Car Dealer license" and "lease

---

[11] The legal description for the Webster city lot is:

Lot Five (5), Block One (1), Porter's First Addition, which is the Subdivision of Lot One (1), Baties 5th Addition to the City of Webster, South Dakota, according to the plat thereof of record, subject to easements, restrictions and reservations of record, if any.

[12] The Court was unable to clearly discern from the record who Neal Noble is. In some documents, his first name is spelled "Neil."

an office/lot as well as . . . obtain a bond, and insurance and whatever else was required."[13]  This version was signed by Beverly Porter as secretary.  One copy of these typed and signed minutes was included among Defendant Atlantic Auto's trial exhibits (A-6), and a second copy was included among Beverly Porter's deposition exhibits.  No differences between the signed minutes were noted.

Defendant Atlantic Auto also placed an unsigned version of these minutes into evidence as part of its Exhibit A-8.  The unsigned version indicated only Beverly Porter and Neal Noble were elected directors, Beverly Porter was elected president, and Neal Noble was elected secretary.  The unsigned minutes were thereafter identical to the signed minutes, except for Neal Noble's last name being omitted from one sentence and the inclusion of signature lines for both Beverly Porter and Neal Noble.  Neither this typed and unsigned version nor the typed and signed version is identified as amended minutes.

Handwritten minutes indicate another Atlantic Auto meeting was held March 2, 2004 in Jupiter, Florida, with Neal Noble and Beverly Porter present.  These minutes state, "A motion was made by Beverly Porter and seconded by Neil [sic] Noble to amend the January 2, 2004 motion to:  remove James Porter as president and director.  The motion was carried."  These handwritten minutes are signed by Beverly Porter as secretary/treasurer.  The reference to the January 2, 2004 motion is inconsistent with the typed and signed minutes, which indicate the annual meeting was held January 12, 2004.  However, January 2, 2004 is the date on the other handwritten document labeled "Amendment."[14]  No testimony was offered to reconcile

---

[13] A surety bond by Atlantic Auto and Nova Casualty Company was signed by the surety agent and dated February 2, 2004, but it was not approved by the Florida Division of Motor Vehicles.  Whether the bond was actually presented to the Florida Division of Motor Vehicles is unknown.

[14] It is possible a typographical error was made by adding or deleting a "1" in the January 2/January 12 dates on these documents related to the 2004 annual

these several documents which referenced Atlantic Auto's 2004 annual meeting.

During her deposition, when asked about the March 2, 2004 handwritten minutes, Beverly Porter testified James Porter was removed as an officer and director because "his credit was really bad," she wanted to get a Florida auto dealers license, and so she "didn't want him involved in it."

At trial, Beverly Porter testified James Porter was removed as an officer and a director because Atlantic Auto needed to obtain a bond to operate in Florida, and could not get one because of his poor credit rating and his relationship with Atlantic Auto.  She acknowledged he continued to serve as her business advisor and to "help [her] out" after he was removed as an officer and director.

According to two different typed sets of minutes, Atlantic Auto held a special meeting on March 8, 2004 at the Raintree Trail property in Florida.  The first set of minutes, which were signed by Beverly Porter as secretary, state Beverly Porter and Neil [*sic*] Noble were present, and Beverly Porter called the meeting to order as president.  These minutes further state, "Due to the dismissal of James Porter as a Director, Beverly Porter was appointed as President and Neal Noble was appointed as Vice President."  No other business was reported, and the meeting was adjourned. The second set of typed minutes, which were unsigned, state, "Neal Noble made a motion to retain James Porter as Sales Manager and Consultant for Atlantic Auto Group, Inc."  The minutes indicate this motion was "approved by a show of hands." No other business was reported.  The signed version was a joint trial exhibit; the unsigned version was part of Defendant Atlantic Auto's Exhibit A-8.

By letter dated June 25, 2004, James M. Cremer, Dacotah Bank's attorney, confirmed an agreement with Robert L. Spears, James Porter's attorney, pursuant to

_____

meeting minutes.  However, because there was more than one version of nearly all the minutes offered into evidence, the Court finds no basis to presume this date conflict arose from a mere typographical error.

which James Porter would be permitted to sell the lake lots to an identified buyer for $178,000, rather than turn them over to the bank pursuant to their earlier settlement agreement.  Two smaller judgments would be paid, and the balance of the proceeds would be paid to Dacotah Bank.  In addition, James Porter would give Dacotah Bank a promissory note for $50,000 plus the cost of unpaid real estate taxes and attorney's fees and costs related to clearing title to the lake lots.  Finally, James Porter would transfer the Webster city lot and "otherwise fully cooperate with the Bank in resolving this, and all other terms of the Settlement Agreement would remain in full force and effect."

According to typed and signed minutes, Atlantic Auto held a special meeting on August 2, 2004 at the Porters' lake home in South Dakota.  The minutes indicate Beverly "presented" a promissory note to Atlantic Auto for a $70,000 loan at 6% interest and payable in ten years.  The minutes state Atlantic Auto was to use the money "to buy and sell used cars" and was to pay interest annually if its "finances permit it."  The minutes do not include an actual vote on the loan.

By letter dated August 30, 2004, Attorney Cremer again wrote Attorney Spears in an effort to complete the transfer of the lake lots and the Webster City lots and obtain the promissory note for the $50,000 plus costs and attorney's fees (a total of $64,838.96) and a mortgage on the lake home to secure the promissory note.  To that end, Attorney Cremer said he was enclosing a title commitment, a spreadsheet of the encumbrances on the real property, and several documents for the Porters to sign, including a deed for the lake lots from Atlantic Auto to the Porters, a non-merger deed in lieu of foreclosure for the lake lots from the Porters to Dacotah Bank, a non-merger deed in lieu of foreclosure for the Webster city lot from the Porters to Dacotah Bank, and a deed for the lake home from Beverly Porter to the Porters.  Attorney Cremer indicated the note and mortgage on the lake home would be sent separately.  He

concluded by stating:

  1.  <u>Pickerel Lake Lots</u>.  These will be conveyed to Dacotah Bank free
      and clear of liens, and encumbrances so the same can be sold to
      [identified buyer.]

  2.  <u>Webster City Lot</u>.  Dacotah Bank will own this free and clear of
      liens, claims and encumbrances.

  3.  <u>Pickerel Lake Home</u>.  Porters will own this subject to Dacotah
      Bank's first mortgage.

The title insurance commitment attached to this letter was dated August 24, 2004.
It confirmed that on that date, the Webster city lot was owned by the Porters, the lake
lots were owned by Atlantic Auto, and the lake home was owned by Beverly Porter.

On September 9, 2004, the Porters transferred the Webster city lot and the lake
lots to Dacotah Bank by separate non-merger deeds in lieu of foreclosure.  The deeds
were not recorded with the Day County Register of Deeds until May 19, 2005.

By letter dated December 22, 2004, Attorney Cremer wrote the other entities
who held encumbrances against the Webster city lot, the lake lots, and the lake home.
He stated James Porter held an interest in all three parcels and the land had a total
value of $212,657.26.[15]  He identified three entities with small secured claims
superior to Dacotah Bank's claim and said Dacotah Bank would pay those claims.  He
also identified four entities with claims junior to Dacotah Bank's claim, including the
SBA's judgment.  Since the value of the three parcels of real property was less than
Dacotah Bank's $497,165.18 claim, he asked those entities to release their liens.
Though the record was sparse, there was some indication they eventually did so.

An October 26, 2004 report from the Day County assessor was attached to
Attorney Cremer's December 22, 2004 letter.  That report indicated Beverly Porter,

_____

[15] In this letter, Dacotah Bank valued the lake lots at only $41,400, not at the
$178,000 purchase offer the bank had acknowledged in Attorney Cremer's June 25,
2004 letter.  Even if Dacotah Bank had used the higher value, however, the total value
of the three parcels of land would still have been only $349,257.26, nearly $150,000
less than Dacotah Bank's $497,165.18 judgment.

with an address at the South Dakota lake home, owned the lake home, valued at $168,250.00; the Porters, with an address at the South Dakota lake home, owned the Webster city lot, valued at $2,600.00; and "Atlantic Auto Group Inc" [*sic*] and "Jim Porter," with an address on Raintree Trail in Jupiter, Florida, owned the lake lots, valued at $41,400.00.[16]  An August 24, 2004 title insurance commitment was also attached to the letter.  It stated Atlantic Auto was the owner of the lake lots.

According to typed minutes, signed by Beverly Porter as secretary, Atlantic Auto's 2005 annual meeting was held on January 9, 2006 (not 2005), at the Raintree Trail property in Florida, with the Porters and Neal Noble present.  There was no evidence to explain this apparent error regarding the date.[17]  These minutes state Beverly Porter and Neal Noble were elected as the sole directors and officers, and "[u]pon the recommendation of consultant, James Porter," the "Florida Dealer location" was changed to an address in West Palm Beach, Florida "due to the cost of the lease."  No other business was reported.

According to typed but unsigned minutes, Atlantic Auto's 2005 annual meeting was held January 10, 2005 at the Raintree Trail property.  The most notable difference between the signed and unsigned versions is in the signed version Beverly Porter was elected both president and secretary, and Neal Noble was elected vice-president; in the unsigned version, Neal Noble was elected secretary (there was no vice-president).  Further, the signed version contains only a signature line for Beverly Porter as secretary; the unsigned version contains one signature line for Beverly Porter

---

[16]  On the assessor's report, there is a typographic symbol between "Atlantic Auto Group Inc" [sic] and "Jim Porter."  It is difficult to tell whether the symbol is an "&" or a "%." If the latter, Atlantic Auto may have then been the sole owner of the lake lots, and its address included "in care of" James Porter.

[17]  *See infra* p.23 for a discussion of the similarities between these minutes labeled as the 2005 annual meeting minutes and another set of minutes labeled as the 2006 annual meeting minutes.

as president and another for Neal Noble as secretary.

In April 2005, a state court jury awarded the Johnsons $150,000 on their counterclaim against James Porter. An amended judgment was entered May 20, 2005, and it is presumed final.

On May 13, 2005, as part of their settlement agreement, James Porter gave Dacotah Bank a promissory note for $61,374.21, comprising $11,374.21 for real estate taxes, certain expenses related to the note, and Dacotah Bank's attorneys' fees, and $50,000 for James Porter's settlement agreement payment. On that same date, the Porters also gave Dacotah Bank a mortgage on their lake home to secure the note.

Grue Abstract Company sent a letter to the Porters on August 24, 2005. A May 19, 2005 title insurance policy was attached to the letter.[18] This title insurance policy stated the lake home was owned by the Porters as joint tenants with rights of survivorship on that date. The policy also reflected Dacotah Bank's May 13, 2005 mortgage was recorded on May 19, 2005 and was the only encumbrance against the lake home other than real estate taxes and easements.

On September 12, 2005, James Porter transferred his interest in the South Dakota lake home back to Beverly Porter via a quitclaim deed for a stated consideration of $1.00. The deed was recorded on September 14, 2005. According to Beverly Porter's November 20, 2007 affidavit, the assessed value of the lake home in June 2004 was $170,850.[19]

---

[18] Grue Abstract Company's letter and the attached title insurance policy were a part of the record as an attachment to Attorney Cremer's December 22, 2004 letter to encumbrance holders (Defendant Beverly Porter's Exhibit P-6), though it is obvious the abstract company's letter could not actually have been an attachment to the bank's attorney's letter.

[19] According to James Porter at his meeting of creditors on February 8, 2007, the appraised value of the lake home was $196,000.

At trial, James Porter testified he transferred the lake home back to Beverly Porter in fulfillment of his earlier agreement with her to do so as part of his settlement agreement with Dacotah Bank.  He said they made the agreement because she had agreed to give Dacotah Bank her interest in the lake lots and the Webster city lot.  He first claimed the couple had reduced their agreement to writing, but later backed away from that statement.  No written agreement was produced.  He also said he executed the quitclaim deed at the demand of his wife, on the advice of Attorney Randall B. Turner, and because he thought he had already done so in connection with the Dacotah Bank settlement agreement.

At trial, Beverly Porter said she learned the lake home was in both their names when she received some title work in the mail, apparently Grue Abstract Company's August 24, 2005 letter.  She said this realization led to a meeting with Attorney Turner, who then prepared the quitclaim deed.  She said she and James Porter had contemplated the lake home would be solely in her name as "part of the agreement with [Dacotah] Bank that Jim made," and she thought the lake home was to go back into only her name after Dacotah Bank cleared the title for its mortgage.  She, too, said the Porters both thought James Porter had already transferred the lake home back to her when the Dacotah Bank settlement agreement was effected because they had "received no paperwork on it."  She acknowledged she and James Porter had only an oral agreement that she would get sole title to the lake home as part of the settlement agreement with Dacotah Bank.  She further acknowledged the written settlement agreement with Dacotah Bank did not reflect that agreement between the Porters.  She said the consideration James Porter received for the transfer was the payments she was making on the Dacotah Bank mortgage debt.  However, while the record indicates Atlantic Auto actually made two mortgage payments totaling $20,000, there was no record of what, if any, mortgage payments Beverly Porter had made

-18-

personally.  She also said she had agreed to apply $8,000 from an early retirement bonus to the settlement agreement with Dacotah Bank, but there was no evidence to corroborate that actually happened.  She conceded James Porter's use and enjoyment of the lake home had not changed since she took sole title, but explained now "he can't make decisions about the property."

The Porters' testimony at trial was inconsistent with other parts of the record.  First, the transfer documents themselves indicate consideration of only $1.00 was given by Beverly Porter to James Porter for his interest in the lake home.  Second, James Porter's chapter 7 statement of financial affairs said this transfer was not made for any consideration.

Third, the August 30, 2004 correspondence between Attorney Cremer and Attorney Spears indicates the parties understood the lake home would be in both the Porters' names when Dacotah Bank's mortgage was placed on it as part of the settlement agreement.  The August 24, 2004 and May 19, 2005 title work reflect the title change from Beverly Porter to the Porters was made as contemplated.  There was no documentation of any understanding between James Porter and Dacotah Bank, between the Porters, or between the Porters and any of their attorneys that indicates once Dacotah Bank's mortgage was in place, the lake home would once again be titled solely in Beverly Porter's name.

Fourth, the Porters' trial testimony was not consistent with their own earlier testimony, especially James Porter's testimony at his meeting of creditors.  At that meeting of creditors, James Porter said he transferred the lake home to his wife in September 2005 "[t]o comply with bankruptcy laws, and because I was at, in -- I was broke."  He acknowledged he did not receive any consideration for the transfer, and he also acknowledged, in agreement with a statement by the trustee, the lake home was transferred solely to Beverly Porter so she would not lose the home to his

creditors.  When the trustee asked, "So you transferred it to keep it out of the reaches of your creditors," he affirmed for a third time when he answered, "That would be correct."  He further acknowledged the lake home had been in both their names in 2000, Beverly Porter had transferred it to Atlantic Auto in 2001, and in 2004 "to work out a deal with Dacotah Bank, it had to go into both of our names to clear the title for Dacotah Bank."[20]  He later added, "Then the property was theoretically supposed to go back in, straight into her name.  And I asked my attorney at that time to do that, and he did not do that."

At trial, James Porter said he could not, due to health issues, recall making those statements at his meeting of creditors.  He was nevertheless able to recall that when he tried to fully explain his agreement with Beverly Porter as part of his settlement agreement with Dacotah Bank, the case trustee "wouldn't let [him] talk about it" and "shut [him] off."  When given the transcript of the meeting of creditors, however, he was unable to specify when the trustee had limited his testimony regarding his deal with Dacotah Bank or any deal with Beverly Porter.

In her deposition, Beverly Porter said Attorney Spears "dropped the ball" and failed to have title to the lake home returned to her name alone after "we" settled with Dacotah Bank.  She implied Attorney Spears had not followed through because he had not been fully paid for his services by James Porter.  She did not make similar allegations at trial.

Fifth, the Porters' trial testimony regarding the transfer of title to their lake home was also inconsistent with the trial testimony of Attorney Spears, who, as

---

[20] The Court was unable to find documentation of the Porters' transfer of the lake home to Atlantic Auto or Atlantic Auto's transfer of the home to Beverly Porter. Title work dated August 24, 2004 confirmed the home was in her name alone on that date.  There was some testimony by Attorney Turner that the lake home was put in her name alone in August 2003.

previously noted, was one of the attorneys who represented James Porter in his lawsuit against the Johnsons and also represented James Porter, Porter Auto, and Atlantic Auto regarding Dacotah Bank's fraudulent transfer action and subsequent settlement agreement.[21]   Attorney Spears testified James Porter contacted him by telephone in October 2004 and requested that he (Attorney Spears) arrange for the transfer of all property out of his (James Porter's) name and into Beverly Porter's name.  Attorney Spears said James Porter's main objective was to get his name off the deed to the lake home.  He said he advised James Porter at that time the requested transfers might affect the settlement agreement with Dacotah Bank because he understood the bank wanted James Porter's name on the lake home.  Attorney Spears said he also advised James Porter the transfer could not be for the purpose of protecting the property from other creditors he had or future claims, and even if the transfer was made with the bank's approval, other creditors might still take issue with it.  Attorney Spears testified there was no discussion on whether there was or could be reasonable consideration from Beverly Porter for the transfers.  In response to an affidavit by Beverly Porter,[22] in which she stated she and James Porter had an agreement that he would transfer his interest in the lake home to her in exchange for her allowing some personal and joint assets to be used in the settlement agreement with Dacotah Bank, Attorney Spears said that alleged understanding was never communicated to him by anyone prior to his initial review of the affidavit, which he

---

[21] Before trial, Trustee Allred filed a motion seeking a declaration that he held Debtor James Porter's attorney-client privilege, to exercise or waive, regarding Debtor's pre-petition communications with Attorneys Randall B. Turner and Robert L. Spears.  No objections to the motion were filed, and the motion was granted (doc. 75).

[22] The only affidavit the Court located in the record was Beverly Porter's November 20, 2007 affidavit, which was attached to documents related to an earlier summary judgment motion.

first saw in early August 2008, just before the trial.

At trial, James Porter said he did not remember an October 2004 conversation with Attorney Spears.  Instead, he stated he had asked Attorney Spears to negotiate with Dacotah Bank, and Attorney Spears had failed to follow through on the complete deal because he did not get the lake home transferred solely to Beverly Porter when the other settlement-related transfers of real estate were made.  He had no recollection of Attorney Spears advising him in October 2004 that a transfer of this asset solely to Beverly Porter might not be lawful as to his creditors.  At times, James Porter essentially testified Attorney Spears was lying about the October 2004 phone call.[23]

Sixth, the Porters' testimony regarding the reason for the transfer of the lake home to Beverly Porter in September 2005 was also not supported by the trial testimony of Attorney Turner, another attorney who had previously represented James Porter and Porter Auto regarding their problems with Dacotah Bank, and who prepared the quitclaim deed for the lake home from James Porter to Beverly Porter in September 2005.[24]  Attorney Turner testified he helped negotiate the August 25, 2003 settlement agreement with Dacotah Bank.  He said he used as leverage the fact that many of the assets at issue were owned by Beverly Porter or Atlantic Auto, not James Porter.  He said the bank countered that the transfer of assets away from James Porter, in particular the transfer of the lake lots to Atlantic Auto, had been fraudulent, though he did not recall seeing the formal fraudulent transfer complaint by the bank or being advised by James Porter that such an action existed.  He also said it was his understanding the lake home was still owned jointly by the Porters.  He testified not much happened to implement the settlement agreement until 2005, after the Johnsons

---

[23] The Court found Attorney Spears to be completely credible.

[24] The Court also found Attorney Turner to be completely credible.

prevailed on their counterclaim against James Porter and Porter Auto in the state court action described above. He recalled the Porters met with him to discuss their financial situation a few days later. He said his notes reflect the Porters told him the lake home had been solely in Beverly Porter's name since August of 2003. He said he met with the Porters again in late August or September 2005 because they wanted to transfer the lake home to Beverly Porter. He said they were upset and told him the lake home was supposed to have been titled in her name only as part of the settlement agreement with Dacotah Bank. He stated while he and the Porters may have earlier discussed protecting assets in which Beverly Porter had an interest, he did not recall any understanding that, as part of the bank settlement agreement, the lake home was to be in Beverly Porter's name only. Attorney Turner said he prepared the quitclaim deed for the lake home within the next few weeks.

Finally, the Porters both testified James Porter agreed to give Beverly Porter not only his interest in the lake home but also his interest in their Florida property in exchange for her agreement to give Dacotah Bank the lake lots and the Webster city lot and allow a mortgage to be placed on the lake home as part of Jim Porter's settlement agreement with the bank. That is, of course, impossible, inasmuch as James Porter transferred his interest in the Porters' Florida property to Beverly Porter on February 12, 2002, long before he entered into the settlement agreement with Dacotah Bank.

Typed minutes, signed by Beverly Porter as secretary, indicate Atlantic Auto held a 2006 annual meeting on January 9, 2006 at the Raintree Trail property in Florida, with the Porters and Neal Noble present. These minutes indicate Beverly Porter was elected president and secretary, and Neal Noble was elected vice-president. The minutes also state a motion was passed "to not renew the Florida Motor Vehicle Dealer License, Insurance, and Bond." No other business was reported.

The first 16 lines of these typed and signed annual meeting minutes are virtually identical to the typed and signed annual meeting minutes for 2005. They contain the same typographical errors (a missing space between "9," and "2006" and one paragraph slightly more indented than the others) and differ only in terms of the year in the title (2005 in one, 2006 in the other). The last paragraph and the typed signature line for Beverly Porter as secretary are also identical, but Beverly Porter's actual signature is different. No explanation was offered for these "similarities" between the signed 2005 and 2006 annual minutes.

Defendant Atlantic Auto also placed into evidence two typed but unsigned versions of its 2006 annual meeting minutes. One of these is an unsigned version of the typed and signed minutes just described. The other indicates Beverly Porter was only elected president (not president and secretary), and Neal Noble was elected secretary (not vice-president). There are also some linguistic, but not substantive, differences from the signed version. This version contains signature lines for both Beverly Porter and Neal Noble. No explanation was offered to explain these "differences" between the signed and unsigned 2006 minutes.

At her deposition, Beverly Porter stated she sold the Raintree Trail property in Florida in February 2006 for "around $300,000." She further stated, "*we* traded down. . . . *We* bought a house that was much smaller [emphasis added]." The new home was on Timberwalk Trail in Florida, and its purchase price was approximately $225,000.[25]

Typed minutes, signed by Beverly Porter as secretary, indicate Atlantic Auto held a special meeting on July 5, 2006 at the South Dakota lake home, with both Porters and Neal Noble present. These minutes indicate motions passed "to get

---

[25] As of August 29, 2008, Beverly Porter still owned this property. She testified it has a $97,000 mortgage against it.

quotes for auto dealer insurance coverage from other companies and buy from the most competitive bid" and "to seek revolving loan funding for credit[.]"  Typed but unsigned minutes were also introduced.  These minutes contained a signature line for Neal Noble as secretary and have a slightly narrower space between the last two paragraphs.  The content is otherwise the same as the signed minutes.[26]

At trial, Beverly Porter testified she loaned $70,000 to Atlantic Auto to buy and sell cars.  She said she obtained this money by refinancing the Raintree Trail property in Florida.  She also stated she had obtained a separate $65,000 home equity line of credit that has now grown to about $100,000.  If Atlantic Auto were liquidated, she said there would be insufficient assets to pay that debt.[27]  There was no documentation in the record, however, of any debt that Atlantic Auto actually owes Beverly Porter.

Beverly Porter indicated, in her deposition, that Atlantic Auto operated out of a garage near the Porters' South Dakota lake home.  She acknowledged at trial that Atlantic Auto, as a Florida corporation, did not have formal authority to do business in South Dakota.  Atlantic Auto's federal income tax returns for 2003, 2004, 2005, and 2006 used the Raintree Trail property as its business address.

The record does not contain any documents, such as a financial statement,

---

[26] The signed version of the July 5, 2006 minutes was offered jointly at trial (Exhibit J-13).  It is also among the exhibits with Beverly Porter's deposition.  The unsigned version was placed in evidence by Defendant Atlantic Auto (part of Exhibit A-8).

[27] Typed minutes, signed by Beverly Porter as secretary, indicate Atlantic Auto's 2007 annual meeting was held January 12, 2007 at the Raintree Trail property in Florida.  The minutes state the Porters and "Neil" [sic] Noble were present.  The officers and directors were left unchanged.  The minutes further state:

A discussion was held about how to increase profits on sales.  Neil [sic] Noble suggested closing the business if this doesn't get accomplished in the next business year.  No action was taken at this time.

identifying Atlantic Auto's assets and liabilities.  In tax year 2003, Atlantic Auto reported gross receipts of $260,660, gross profit of $28,297, but taxable income of <$3,098.>  In tax year 2004, it reported gross receipts of $466,495, gross profit of $38,586, but zero taxable income.  In tax year 2005, it reported gross receipts of $465,214, gross profit of $40,005, but ordinary business loss of $6,375.  (It also started filing as an S corporation).  In tax year 2006, it reported gross receipts of $319,218, gross profit of $57,088, but ordinary income loss of $6,891.  Its federal income tax returns for all four years indicate no wages or salaries were paid, and officers were not compensated.  Corporate expenses reported in 2003 include $13,327 for "professional fees," which are not further explained therein.  Expenses reported in 2005 include $11,000 for legal fees and $2,204 for "blacktop lot," which Beverly Porter described in her deposition as an improvement made to an area near their lake home.

Beverly Porter said Atlantic Auto paid James Porter's legal bills because it (Atlantic Auto) had also been sued.  She acknowledged Atlantic Auto had paid one attorney who represented James Porter on an assault allegation that did not involve Atlantic Auto.  In her deposition, she said Atlantic Auto's money was all she had available to pay these legal bills and other personal expenses for James Porter.  At her deposition, Beverly Porter also acknowledged she took money out of Atlantic Auto twice to pay a portion of the real estate taxes on the lake home, which she justified based on the corporation having an office in the garage.  Atlantic Auto also apparently purchased and maintains a pontoon boat kept at the South Dakota lake home, but no business purpose for this watercraft was established.

Other expenses Atlantic Auto paid, according to Beverly Porter's testimony, included the repair of a refrigerator at the corporate "office" in South Dakota, local and long distance telephone service (under one number for the Porters personally and the

-26-

business) and internet service at the Florida property.  Beverly Porter defended these as legitimate business expenses for Atlantic Auto.

Many of Atlantic Auto's checks were signed by James Porter, though no corporate resolution in evidence authorized him to sign checks or pay the underlying bills.  Of the 37 checks placed in evidence at trial, five were made out to cash or the bank, and the payee on another was left blank.  Of these five, James Porter signed four totaling $10,955, and Beverly Porter signed one for $2,900.  Neither Beverly Porter nor James Porter adequately explained these five checks or provided any documentation to support their claims that most were business-related.  Contrary to her prior statements that some auto auctions would not take checks from them, Beverly Porter admitted the auto auctions did not necessarily refuse to take Atlantic Auto's checks; she and James Porter sometimes simply chose to deal in cash.

On December 19, 2006, James Porter filed a chapter 7 petition in bankruptcy and supporting schedules and statements.  Debtor's schedules were incomplete and internally inconsistent.[28]  Though he indicated on schedule A that he did not own any real property or nonexempt personal property, and though Dacotah Bank had obtained lien satisfactions from several creditors, James Porter still scheduled the SBA as a secured creditor.[29]  In his statement of financial affairs, James Porter said he had paid

---

[28] On his December 19, 2006 schedules, Debtor listed Dacotah Bank's secured debt on schedule D at $60,000.  A day later (December 20, 2006), Atlantic Auto paid Dacotah Bank $10,000, and three days later (December 23, 2006), it paid Dacotah Bank another $10,000 from a different account.  The actual amount of the debt presently owed to Dacotah Bank is unknown.

[29] A more minor error occurred in Debtor's statement of financial affairs.  For question 18.a., Debtor checked the box that indicated he did not have an interest in a business within the preceding six years, but at the end of the question, he listed Atlantic Auto, gave a Jupiter, Florida address for it, and said the business began in February 2001 and ended in 2004.  Nothing in the subsequent record in the main case or adversary proceeding indicated Atlantic Auto ceased operations in 2004.  The Court presumes Debtor erroneously listed 2004 in reference to the date board minutes indicate he ceased being an officer or director for Atlantic Auto.

his bankruptcy attorney $210 in fees and Atlantic Auto had paid his attorney another $1,500. His bankruptcy attorney's disclosure of compensation indicated only Debtor James Porter had paid him.

James Porter's schedules and statements were also inconsistent with his testimony at the meeting of creditors.[30]   Though he stated in his schedules and testified at the meeting that he had been unemployed since 2001 and did not have any business interests, he listed several debts for advertising, including a judgment dated August 1, 2003 for $17,146.  Since he did not list any co-debtors, he essentially declared Porter Auto, Atlantic Auto, and Beverly Porter were *not* co-obligors on these advertising debts.  He testified at his meeting of creditors that his wife had income from her teacher's retirement pay, but he failed to list any income for her on schedule I.  In his statement of financial affairs, he said he had possession of various vehicles owned by Atlantic Auto.   At his meeting of creditors, upon prompting from his attorney, James Porter said he provided that information only because he occasionally drives Atlantic Auto's vehicles.

Portions of James Porter's statement of financial affairs were not well supported by his subsequent trial testimony.  At trial, James Porter testified that when he transferred the Caloosahatchee Drive property to Beverly Porter in 2002, he was a Florida resident, but by October 2005 he no longer considered himself a Florida resident.  He did not explain his thinking on this point.  In his statement of financial affairs, however, he did not disclose any prior addresses for himself in the preceding three years, which would encompass nearly all of 2004, 2005, and 2006.  His

---

[30] James Porter's schedule J does not itemize his monthly expenses. It includes only a single entry of $2,526.00 for "expenses . . .determined by the credit counseling service attached to the Counseling Certificate."   That certificate is no more illuminating. It lists the same $2,526.00 for "Estimated DRS Payment." While  "DRS" is not defined, it presumably stands for Debt Reduction Services, the name of the credit counseling agency.

statement of financial affairs is more consistent with his voting record, which indicates he has regularly voted in South Dakota since 1990.[31]

Forrest C. Allred, the trustee for James Porter's bankruptcy case, commenced this adversary proceeding initially against the Porters. In his first count, Trustee Allred asked the Court to avoid under 11 U.S.C. § 548 James Porter's transfer of co-owned property in South Dakota and Florida to Beverly Porter. He seemingly also asked the Court to avoid under § 548 James Porter's transfer of Atlantic Auto to Beverly Porter. In his second count, he asked the Court to avoid under 11 U.S.C. § 544 and applicable nonbankruptcy law James Porter's transfers of co-owned property in South Dakota and Florida. In his third count, Trustee Allred asked the Court to impose a constructive or resulting trust on the Florida co-owned property and Beverly Porter's interest in Atlantic Auto, based on the relationship between the Porters and the Florida co-owned property and between the Porters and Atlantic Auto.

Trustee Allred filed a motion for summary judgment, which the Court denied. James Porter was dismissed as a defendant, and Atlantic Auto was added as a defendant. A trial was held August 29, 2008, with testimony and exhibits received as set forth above. Written closing arguments were filed thereafter.

### Count 1 - Avoidance of Fraudulent Transfers under § 548(a).

Section 548(a) of the Bankruptcy Code allows a trustee to avoid transfers infected by either actual fraud or constructive fraud. *BFP v. Resolution Trust Corp.*, 114 S.Ct. 1757, 1760 (1994). The trustee must show each element of an avoidable transfer by a preponderance of the evidence. *Brown v. Third National Bank (In re*

---

[31] James Porter did not dispute that he has continued to vote in South Dakota. He said he did so because a local South Dakota state court judge had "announced" sometime in the 1990s that a person who was a member of the Pickerel Lake association (where the Porters' lake home was located), no matter where they came from, could register and vote in Day County.

*Sherman)*, 67 F.3d 1348, 1353 (8th Cir. 1995).  If the trustee establishes a confluence of several badges of fraud, he is entitled to a presumption of actual fraudulent intent and the burden shifts to the transferee to prove some legitimate supervening purpose. *Kelly v. Armstrong*, 141 F.3d 799, 802-03 (8th Cir. 1998).  For a transfer to be avoided for either actual fraud under § 548(a)(1)(A) or constructive fraud under § 548(a)(1)(B), the transfer at issue must have been within two years of the filing of debtor's petition.

*Actual fraud.*  Under § 548(a)(1)(A), a trustee may avoid a transfer if the debtor made the transfer with the actual intent to hinder, delay, or defraud present or future creditors.  Because fraud can rarely be established by direct evidence, fraudulent intent may be inferred from the circumstances surrounding the transfer.  *Sherman*, 67 F.3d at 1353.  To determine whether circumstantial evidence establishes a fraudulent intent, courts consider whether any "badges of fraud" are present.  *Id*.

> The presence of a single badge of fraud is not sufficient to establish actual fraudulent intent; however, "the confluence of several can constitute conclusive evidence of an actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose."

*Id*. at 1354 (quoting *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1254-55 (1st Cir. 1991)(quote therein omitted)).  The badges of fraud to consider include whether:

(1)    the transfer was to an insider;

(2)    the debtor retained possession or control of the property after the transfer;

(3)    the transfer was concealed;

(4)    before the transfer was made, the debtor had been sued or threatened with suit;

(5)    the transfer was of substantially all the debtor's assets;

(6)    the debtor absconded;

(7)     the debtor removed or concealed assets;

(8)     the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred;

(9)     the debtor was insolvent or became insolvent shortly after the transfer was made;

(10)    the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11)    the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*Sherman,* 67 F.3d at 1354 (utilizing applicable state's common law badges of fraud).

*Constructive fraud.* Under § 548(a)(1)(B), a trustee may avoid a transfer if the transfer was for less than a reasonably equivalent value, and the debtor was insolvent at the time of the transfer or the debtor intended or believed he would incur debts beyond his ability to pay. *Meeks v. Don Howard Charitable Remainder Trust (In re Southern Health Care of Arkansas, Inc.)*, 309 B.R. 314, 318 (B.A.P. 8th Cir. 2004). Value is defined as "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor[.]" 11 U.S.C. § 548(d)(2)(A). Whether the debtor received "reasonably equivalent value" for the transfer is a question of fact. *Jacoway v. Anderson (In re Ozark Restaurant Equip. Co.)*, 850 F.2d 342, 344 (8th Cir. 1988). It is answered by determining whether the debtor received "value that is substantially comparable to the worth of the transferred property[.]" *BFP,* 114 S.Ct. at 1767. Further,

> [w]hen evaluating a transfer for reasonable equivalency of value as compared to a money payment, a court must examine the whole transaction and measure all the benefits--whether they be direct or indirect. *Christians v. Crystal Evangelical Free Church (In re Young)*, 82 F.3d 1407, 1415 (8th Cir. 1996)(holding that the trustee could not recover tithes to a church under 11 U.S.C. § 548), *vacated*, 521 U.S. 1114, 117 S.Ct. 2502, 138 L.Ed.2d 1007 (1997)(vacating for further consideration on the legitimacy of the Religious Freedom Restoration Act), *reinstated*, 141 F.3d 854 (8th Cir.1998), *cert. denied*, 525 U.S.

> 811, 119 S.Ct. 43, 142 L.Ed.2d 34(1998). If the measure for
> reasonable equivalency is the value of an indirect benefit then that
> benefit must be tangible. *Richards & Conover Steel, Co.*, 267 B.R. at
> 612-13. Transfers made by a debtor for the benefit of a third party, by
> themselves, do not provide any reasonable equivalent benefit for the
> debtor. *Dietz v. St. Edward's Catholic Church (In re Bargfrede)*, 117
> F.3d 1078, 1080 (8th Cir. 1997)(holding that the receipt of an indirect,
> non-economic, intangible, psychological benefit was not sufficient to
> constitute reasonable equivalent value).

*Meeks v. Don Howard Charitable Remainder Trust (In re Southern Health Care of Arkansas, Inc.)*, 309 B.R. 314, 319-20 (B.A.P. 8th Cir. 2004). In other words, chimerical benefits will not prevent a transfer from being avoided under § 548(a)(1)(B). *Id*. at 320. A tangible, direct, and economic benefit to the debtor must be demonstrated on the record. *Id.* Indirect, non-economic benefits in the form of a release of a possible burden on a family relationship or other intangible, psychological benefits do not constitute reasonably equivalent value. *Dietz v. St. Edward's Catholic Church (In re Bargfrede)*, 117 F.3d 1078, 1080 (8th Cir. 1997)(cites therein).

Only one of the transfers the trustee seeks to have avoided occurred within two years of Debtor James Porter's petition date of December 19, 2006: James Porter's transfer of his interest in the lake home in South Dakota to Beverly Porter on September 12, 2005. Trustee Allred clearly made a *prima facie* case this transfer was made with the intent to defraud James Porter's creditors. James Porter admitted three times during his meeting of creditors that he conveyed his interest in the South Dakota lake home to Beverly Porter to keep it from his creditors. The Porters' attempts to whitewash those statements with an alternative theory – that the transfer was intended as part of the settlement agreement with Dacotah Bank – were not credible. Other indicia of actual fraud are also present: James Porter transferred his interest in the lake home to Beverly Porter, an insider, but retained full use and enjoyment of the property; three large judgments had been entered against him, one very recently; and James Porter had few other known assets.

Even if the Court were to believe the Porters' story that James Porter transferred his interest in the lake home to Beverly Porter as part of the Dacotah Bank settlement agreement, the transfer would still be constructively fraudulent under § 548(a)(1)(B). James Porter admitted he was insolvent when the transfer was made. Consideration was also wholly lacking. Beverly Porter only gave up her half-interest in the Webster city lot, which had an assessed value of $2,600 in October 2004, and she allowed a mortgage for $61,374.21 to be placed on the lake home. The mortgage amount was less than one-half the value of the home (assessed value of $168,250 in October 2004) and so it did not impair her interest in the lake home, especially given the fact that the Dacotah Bank settlement agreement removed all other encumbrances against the lake home. Atlantic Auto, not Beverly Porter, gave up title to the lake lots to Dacotah Bank, so the lake lots cannot be viewed as consideration she gave in exchange for James Porter's interest in the lake home. While Beverly Porter said she made some mortgage payments, her testimony was not supported by any documentation regarding the dates and amounts of those payments. The record only shows Atlantic Auto made two post-petition mortgage payments totaling $20,000 on the lake home. While there was some testimony Beverly Porter had agreed to apply an early retirement bonus to James Porter's $50,000 settlement agreement payment, the May 13, 2005 promissory note's Disbursement Request and Authorization indicates James Porter borrowed the full $50,000, and the Porters offered no documentary evidence that her bonus was used later to reduce the balance of the note. Moreover, any benefit to James Porter in the form of a release of a burden on the marital relationship and preservation of the couple's union did not constitute additional consideration for the transfer of his interest in the South Dakota lake home to Beverly Porter. Thus, James Porter's transfer of his interest in the lake home to his wife may be avoided as both an actually fraudulent transfer and a constructively

fraudulent transfer under § 548(a)(1).

The record does not demonstrate the entire lake home should be considered James Porter's. Both the Porters earned income before the lot was purchased and the garage and lake home were built. Both testified they each contributed funds for the lot and home. The only evidence to the contrary was a recollection by Attorney Spears that James Porter had made an offhand statement that all the property co-owned by the Porters was actually his alone. That is not enough for this Court to conclude Beverly Porter does not have a recognizable joint tenancy interest in the property.

### Count 2 - Avoidance of Transfers under § 544 and Applicable Nonbankruptcy Law.

A chapter 7 trustee may, under 11 U.S.C. § 544, utilize nonbankruptcy law to recover or collect assets of the estate or to have certain transfers avoided for the estate's benefit. *Ries v. Wintz Properties, Inc. (In re Wintz Co.)*, 230 B.R. 848, 859 (B.A.P. 8th Cir. 1999); *Ries v. Ibach (In re Ibach)*, 399 B.R. 61, 65-66 (Bankr. D. Minn. 2008). Section 544(a) gives the trustee certain "strong arm" powers by allowing him to step into the shoes of a hypothetical judicial lien creditor, § 544(a)(1), a hypothetical creditor with an execution returned unsatisfied, § 544(a)(2),[32] or a hypothetical bona fide purchaser without notice, § 544(a)(3), and utilize whatever remedies those types of creditors might have under the substantive law governing the property in question. *Smith v. Mark Twain National Bank*, 805 F.2d 278, 284 (8th Cir. 1986). These strong arm provisions are commonly utilized by the trustee, for example, to recover assets when a particular transfer was defective in form or

---

[32] Section 544(a)(2) has not been utilized very often in this Circuit. This particular provision was said to have been created to protect the bankruptcy estate from any "quirks of local procedural law" that give remedial rights to creditors who had an execution returned unsatisfied. *See Mixon v. Anderson (In re Ozark Restaurant Equipment Co.)*, 816 F.2d 1222, 1230 n.12 (8th Cir. 1987).

perfection. *See Union Planters Bank v. Burns (In re Gaylord Grain L.L.C.),* 306 B.R. 624, 628-29 (B.A.P. 8th Cir. 2004); *Ibach*, 399 B.R. at 65-66. Under § 544(b)(1), the trustee steps into the shoes of an actual unsecured creditor holding an allowed claim and utilizes whatever state or nonbankruptcy federal law remedies that particular creditor might have. *Williams v. Marlar (In re Marlar)*, 267 F.3d 749, 753 (8th Cir. 2001) (cited in *Stalnaker v. DLC, Ltd. (In re DLC, Ltd.)*, 295 B.R. 593, 601 (B.A.P. 8th Cir. 2003)).

Though his complaint and brief were a bit imprecise, Trustee Allred appears to be principally relying on § 544(b)(1),[33] so the Court will focus its attention there. Debtor James Porter scheduled several unsecured claim holders. Consequently, Trustee Allred may proceed under § 544(b).

Both South Dakota and Florida have adopted the Uniform Fraudulent Transfer Act ("UFTA").[34] S.D.C.L. ch. 54-8A; F.S.A. §§ 726.102 through 726.112. Unless displaced by UFTA, both South Dakota and Florida have declared the UFTA is supplemented by

> principles of law and equity, including the law merchant and the law relating to principal and agent, estoppel, laches, fraud, misrepresentation, duress, coercion, mistake, insolvency, or other validating or invalidating cause[.]

S.D.C.L. § 54-8A-10; F.S.A. § 726.111. Under UFTA, the case trustee bears the burden of proof by a preponderance of the evidence. *Prairie Lakes Health Care System, Inc. v. Wookey*, 583 N.W.2d 405, 411-14 (S.D. 1998); *Wieczoreck v. H &*

---

[33] Trustee Allred used the term "Judicial Lien Creditor" in the title to Count 2 but did not thereafter cite either § 544(a) or § 544(b). Because he alleged the transfers were fraudulent and referenced S.D.C.L. ch. 54-8A and F.S.A. ch. 726, the Court presumes Trustee Allred intended to proceed under § 544(b)(1).

[34] The states' statutes are virtually identical except Florida uses numerals rather than words for numbers. For example, South Dakota's statute will read "four years," while Florida's will read "4 years." Those differences are not further recognized herein.

*H Builders, Inc.*, 475 So.2d 227, 228 (Fla. 1985).  It covers both transfers made with an actual intent to hinder, delay, or defraud a creditor, S.D.C.L. § 54-8A-4(a)(1) and F.S.A. § 726.105(1)(a), and constructively fraudulent transfers, where intent is not at issue.  S.D.C.L. §§ 54-8A-4(a)(2) [as to present or future creditors], 54-8A-5(a) [as to present creditors], and 54-8A-5(b) [as to present creditors]; F.S.A. §§ 726.105(1)(b) [as to present and future creditors], 726.106(1) [as to present creditors], and 726.106(2) [as to present creditors].

*Actual fraud under state law.*[35]  Actual fraud under S.D.C.L. § 54-8A-4(a)(1) or F.S.A. § 726.105(1)(a) may be established by circumstantial evidence.  *Andrews v. Reynolds*, 409 N.W.2d 128, 130 (S.D. 1987)(citing *Kary v. Kary,* 318 N.W.2d 334, 338 (S.D. 1982)).  A close relationship between the parties to a conveyance justifies heightened scrutiny of the transfer for indicia of fraud.  *Andrews*, 409 N.W.2d at 130 (cites therein).  Indicia of actual fraud, or factors, that may be considered are identical to the badges of fraud considered under 11 U.S.C. § 548(a)(1)(A).   S.D.C.L. § 54-8A-4(b); F.S.A. § 726.105(2)(a).  In South Dakota, an inference of fraudulent intent may be drawn if one or more factors are present, but a presumption of fraudulent intent is not created.  *Wookey*, 583 N.W.2d at 411 (cites therein).  Moreover, the burden of proof remains with the party seeking to have the transfer avoided; it does not shift.  *Id*.  In Florida, a fraudulent intent may be presumed if numerous factors under § 726.105(2) are present.  *Amjad Munim, M.D., P.A. v. Azar*, 648 So.2d 145, 152 (Fla. App. 4 Dist. 1994).  An action based on actual fraud must be brought   within four years after the transfer was made or within one year after the transfer was or could reasonably have been discovered.  S.D.C.L. § 54-8A-9(a); F.S.A. § 726.110(1).

---

[35] In addition to the UFTA, South Dakota has retained S.D.C.L. § 54-8-1, which renders intentionally fraudulent transfers "void against all creditors."

*Constructive fraud under state law.* Under S.D.C.L. §§ 54-8A-4(a)(2) and 54-8A-5(a) and F.S.A. §§ 726.105(1)(b) and 726.106(1), a transfer may be deemed fraudulent as to a debtor's existing creditors even if the transfer was made without a specific intent to defraud. This "constructive" fraud may be found when a transfer is made without the debtor receiving a reasonably equivalent value in exchange for the transfer if the debtor was insolvent when the transfer was made or became insolvent as a result of the transfer. Sections 54-8A-2 and 726.103 define insolvency. This section of the UFTA provides a debtor is insolvent if his debts exceed his assets, S.D.C.L. § 54-8A-(2)(a) and F.S.A. § 726.103(1), or the debtor is generally not paying his debts as they become due, S.D.C.L. § 54-8A-2(b) and F.S.A. § 726.103(2). Once a party establishes the elements of a constructively fraudulent transfer, the burden shifts to the opposing party asserting any defenses to avoidability under S.D.C.L. § 54-8A-8 or F.S.A. § 726.109. An action regarding a constructively fraudulent transfer must be brought within four years of the transfer. S.D.C.L. § 54-8A-9(b) and F.S.A. § 726.110(2).

As more fully discussed above regarding Count 1, the record is clear that James Porter's transfer of his interest in the South Dakota lake home to Beverly Porter was both actually fraudulent and constructively fraudulent. Further, the trustee's action was brought timely under S.D.C.L. § 54-8A-9(b). Accordingly, all the elements under 11 U.S.C. § 544(b) and S.D.C.L. §§ 54-8A-4(a)(1), 54-8A-4(a)(2), and 54-8A-5(a) are present, and James Porter's transfer of his interest in the South Dakota lake home to Beverly Porter will be avoided under applicable state law.

As to the property in Florida, James Porter transferred his interest in the Caloosahatchee Drive property to Beverly Porter on February 12, 2002. Trustee Allred brought this action on May 24, 2007. Therefore, that transfer was not within four years of the complaint and cannot be avoided under Florida's UFTA. Though Trustee

Allred may not have learned of the transfer until Debtor filed his statement of financial affairs on December 19, 2006, there is nothing in the record to indicate the transfer could not have been reasonably discovered sooner.  *See Haskins v. City of Ft. Lauderdale*, 898 So.2d 1120, 1123-24 (Fla. App. 4 Dist. 2005)(party seeking to escape statute of limitations has burden of proving circumstances that toll the statute).  That the Porters did not report the transfer to their South Dakota creditors is not enough of a record for this Court to apply the one-year limitation under F.S.A. §§ 726.105(1)(a) and 726.110(1).

As to subsequent purchases of other properties by Beverly Porter, into which the proceeds from the Caloosahatchee Drive property were rolled over, Trustee Allred's complaint and the record are not sufficient for the Court to conclude the rollovers were transfers by James Porter or the rollovers were either actually or constructively fraudulent.  There was too little evidence of what monies James Porter contributed toward the purchase of the Caloosahatchee Drive property, what portion of the proceeds from the sale of that property constituted equity in the Raintree Trail and Timberwalk Trail properties, and what additional financial contributions James Porter may have made toward the purchase of the Raintree Trail and Timberwalk Trail properties without obtaining a formal ownership interest while still fully enjoying the benefits of ownership.

To the extent Trustee Allred has asked, in Count 2, that James Porter's transfers to Atlantic Auto also be avoided as fraudulent, the Court is unable to identify any such transfers from the record.  The one exception would be the South Dakota lake lots, which the Porters placed into Atlantic Auto's name for no known consideration.  Dacotah Bank, however, already "undid" that transfer before James Porter filed bankruptcy.

*Avoidable under federal law.*  Trustee Allred also asked the Court to consider whether the February 12, 2002 transfer of the Caloosahatchee Drive property from James Porter to Beverly Porter was avoidable as either a fraudulent or preferential transfer under 11 U.S.C. § 544(b) and nonbankruptcy federal law, in particular 28 U.S.C. § 3301, *et seq.*, the Federal Debt Collection Procedures Act ("FDCPA"). Debtor James Porter scheduled the SBA as an undersecured creditor.  The fact that the SBA did not timely file a proof of claim in this case does not appear to preclude Trustee Allred's reliance on the FDCPA.[36]  Section 544(b)(1) requires the trustee to show there is at least one unsecured creditor holding an allowable claim under § 502 who, at the time the subject transfer occurred, could have utilized the cited federal law to avoid the transfer. *Williams v. Marlar (In re Marlar)*, 267 F.3d 749, 753 (8th Cir. 2001)(citing *Young v. Paramount Communications, Inc. (In re Wingspread Corp*.), 178 B.R. 938, 945 (Bankr. S.D.N.Y. 1995)).  The SBA's claim meets both requirements. First, the SBA had an allowable claim on the petition date, *i.e.*, it could have timely filed a proof of claim for the unpaid balance of its judgment. *DLC, Ltd.,* 295 B.R. at 601-02.  That it gave up its judgment lien on the South Dakota lake home pre-petition did not eliminate its *in personam* claim.  Second, the SBA could have brought a pre-petition action under 28 U.S.C. § 3301, *et seq.*, to avoid the transfer of James Porter's interest in the Caloosahatchee Drive property to Beverly Porter because its claim constituted a debt to the United States.  Trustee Allred may therefore step into the SBA's shoes under § 544(b)(1).

---

[36]  Trustee Allred advised the Court in his written closing arguments that the SBA has recorded an abstract of its judgment in Florida so as to obtain a judgment lien under 28 U.S.C. § 3201(a).  That information is not part of the trial record, however, and Trustee Allred is no longer seeking the recognition of a judgment lien on the Florida property under 28 U.S.C. § 3201(a).

The provisions of FDCPA are very similar to those of UFTA.  FDCPA includes provisions that allow both an actually fraudulent transfer and a constructively fraudulent transfer to be avoided.  28 U.S.C. § 3304(a) (constructively fraudulent as to existing debt), § 3304(b)(1)(A) (actual intent to defraud regarding existing or future debt), § 3304(b)(1)(B) (constructively fraudulent as to existing or future debt), and § 3306 (remedies).  When considering whether a debtor acted with actual fraudulent intent, the same badges of fraud are considered.  28 U.S.C. § 3304(b)(2).  When assessing whether a constructively fraudulent transfer has occurred, FDCPA utilizes similar definitions for insolvency.  28 U.S.C. § 3302.

An action to avoid a fraudulent transfer under §§ 3304(a)(1), 3304(b)(1)(A), and 3304(b)(1)(B) must be brought within six years of the transfer.  28 U.S.C. § 3306(b).  An action to avoid a fraudulent transfer under § 3304(a)(2) must be brought within two years of the transfer.  *Id.*  Since the subject transfer was on February 12, 2002, and Trustee Allred brought his complaint on May 24, 2007, Trustee Allred's complaint is timely under §§ 3304(a)(1), 3304(b)(1)(A), or 3304(b)(1)(B), but not under § 3304(a)(2).

It is clear James Porter's transfer of his interest in the Caloosahatchee Drive property on February 12, 2002 was constructively fraudulent under § 3304(a)(1).  By his own admission, he was insolvent at the time.  He also acknowledged he received no consideration from Beverly Porter for the transfer, and the deed corroborates that.  Moreover, any future support Beverly Porter might provide did not constitute value for the transfer.  28 U.S.C. § 3303(a).

There is also sufficient evidence for the Court to conclude James Porter made the transfer with an actual intent to hinder, delay, or defraud his creditors under § 3304(b)(2).  Several badges of fraud existed.  The transfer was to an insider.  28 U.S.C. § 3304(b)(2)(A).  His use and enjoyment of the property did not change.

-40-

28 U.S.C. § 3304(b)(2)(B).  The Porters did not disclose the transfer to his creditors back in South Dakota.  28 U.S.C. § 3304(b)(2)(C).  Less than a month before the transfer, Dacotah Bank had obtained a judgment against James Porter for $497,165.18, the SBA had brought suit against James Porter and Porter Auto for $223,351.62 plus accruing interest, and the Johnsons' counterclaim was still pending in state court.  28 U.S.C. §§ 3304(b)(2)(D) and (J).  James Porter had few other assets.  28 U.S.C. § 3304(b)(2)(E).  Beverly Porter did not give any consideration for the transfer.  28 U.S.C. § 3304(b)(2)(H).

The trickier issue is whether the Caloosahatchee Drive property was an asset subject to avoidance under §§ 3304(a)(1) or § 3304(b)(1)(A), since it was real property the couple held by a tenancy in the entirety.  The Court agrees with Trustee Allred that property a debtor may claim exempt is still subject to avoidance.  *See Tavenner v. Smoot*, 257 F.3d 401, 406-07 (4th Cir. 2001).  The Court also agrees with Trustee Allred that if Debtor James Porter's interest in the Caloosahatchee Drive property is returned to the bankruptcy estate, he may not thereafter declare it exempt under 11 U.S.C. § 522(g).  All that being so, however, what still remains unanswered is whether the Caloosahatchee Drive property was an "asset" of James Porter's as defined by § 3301(2), which does not encompass any bankruptcy law.

Under § 3301(2)(C), property held in tenancy by the entirety may be an asset subject to the avoidance provisions of subchapter D of Title 28, but only if that interest was "subject to process by the United States holding a claim against only one tenant or co-owner."  At trial, Trustee Allred did not identify what statute, regulation, or provision of federal common law, exercisable by the SBA, subjected the Caloosahatchee Drive property to process for the SBA's claim against only James

Porter.  Though such law may exist, it was not provided in this record.[37]  Accordingly, no relief can be given under the FDCPA in this case.

### Count 3 - Constructive or Resulting Trust on the Florida Property, Atlantic Auto, or Defendant Beverly Porter's Interest in Atlantic Auto.

In Count 3, Trustee Allred asked the Court to impose a constructive or resulting trust on the Florida-related property, *i.e.*, the Florida property, Atlantic Auto, and Defendant Beverly Porter's interest in Atlantic Auto.  The facts and law do not support the application of either.

Under Florida law, "[a] constructive trust is one raised by equity in respect of property which has been acquired by fraud, or where, though acquired originally without fraud, it is against equity that it should be retained by him who holds it." *Quinn v. Phipps*, 113 So. 419, 422 (Fla. 1927)(quoted in *Provence v. Palm Beach Taverns, Inc.*, 676 So.2d 1022, 1025 (Fla. App. 4 Dist. 1996)).  It is an equitable remedy based upon an established cause of action, not a traditional cause of action itself. *Diamond "S" Development Corp. v. Mercantile Bank*, 989 So.2d 696, 697 (Fla. App. 1 Dist. 2008).

The record shows virtually all of Trustee Allred's allegations regarding the formation and operation of Atlantic Auto are true.  Though Beverly Porter may have been the sole shareholder, James Porter was actually the person who formed and operated Atlantic Auto.  Atlantic Auto was not authorized to do business in South Dakota.  Atlantic Auto paid some of James Porter's personal expenses, including legal bills, paving at the South Dakota lake home, and mortgage payments on the South Dakota lake home.  Neither Atlantic Auto nor James Porter recognized these expenditures as taxable income for James Porter.  James Porter wrote checks on Atlantic Auto's account, though he had not been formally authorized to do so.  Some

---

[37] See *supra* n.36.

of those checks were made out to cash, and the Porters were unable to provide satisfactory explanations of where this cash went.  Some or all of this "cash" may have been additional unreported income to James Porter.  James Porter's removal as a director and the president of Atlantic Auto was procedurally irregular.  In addition to those allegations proven at trial, it is also clear from the trial record that the Porters disregarded corporate formalities, failed to keep good corporate minutes, and altered or falsified, for unknown reasons, at least some of Atlantic Auto's corporate minutes.

All that said, however, the record does not show Atlantic Auto is holding anything that would be inequitable for it to keep to the detriment of James Porter's bankruptcy creditors.  In other words, the record does not show Atlantic Auto is holding something on which a constructive trust should be imposed, such as undistributed profits that should be recognized as income to James Porter or corporate assets that should be recognized as property of James Porter's bankruptcy estate.  Accordingly, while the Porters may have violated any number of corporate and tax laws, the record does not show a constructive trust should be placed on Atlantic Auto, its assets, or Beverly Porter's shares in it.

To the extent Trustee Allred has also asked for the imposition of an equitable lien, a similar result is reached.  An equitable lien, under Florida law, may be imposed upon property purchased with fraudulently obtained funds, even if a co-owner spouse is innocent or ignorant of the fraud.  *Hecker v. Kokomo Spring Co. (In re Hecker)*, 264 Fed. Appx. 786, 789-91 (11th Cir. 2008); *see also Zureikat v. Shaibani*, 944 So.2d 1019 (Fla. App. 5 Dist. 2006)(F.S.A. § 56.29 may be used to set aside transfers of misappropriated funds traced into a Florida home declared exempt by the judgment debtor).  There has been no showing misappropriated funds or funds fraudulently obtained by James Porter were used in the purchase of the Porters' Florida properties. There has been no showing misappropriated funds or funds fraudulently obtained by

James Porter have been secreted in Atlantic Auto's accounts or converted to other assets held by Atlantic Auto.

Finally, to the extent Trustee Allred wants the Court to disregard Atlantic Auto as a corporate entity and recover its assets for Debtor James Porter's bankruptcy creditors, the record is again insufficient.  While the Court has no trouble concluding James Porter dominated and controlled the corporation to the extent it had no independent existence and the corporate form was largely ignored and sometimes used for improper purposes, Trustee Allred did not show the Porters' creation and use of Atlantic Auto caused James Porter's creditors injury.  *See Welt v. Jacobson (In re Aqua Clear Technologies, Inc.)*, 361 B.R. 567, 577 (Bankr. S.D. Fla. 2007). Accordingly, the Court cannot fashion any equitable relief in which Atlantic Auto's corporate form should be disregarded.

### Remedy.

Since the trustee has demonstrated under § 548 and under § 544(b) and applicable state law that James Porter's interest in the lake home was fraudulently conveyed to Beverly Porter, the Court must look to 11 U.S.C. § 550(a) to determine the extent of what the trustee may recover.  *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 809-10 (9th Cir. 1994); *Decker v. Voisenat (In re Serrato)*, 214 B.R. 219, 231-32 (Bankr. N.D. Cal. 1997)(state law limitation of recovery amount on fraudulent transfer did not control; § 550 of Bankruptcy Code does).  Under § 550(a), the Court, in its discretion, may order that the trustee shall recover either the property transferred or its value.  *Kaler v. McLaren (In re McLaren)*, 236 B.R. 882, 903 (Bankr. D.N.D. 1999).  If the value of the assets is to be returned, the present value is used since it reflects what would be in the bankruptcy estate if the property were still there. *Feltman v. Warmus (In re American Way Service Corp.)*, 229 B.R. 496, 530-31 & n. 14 (Bankr. S.D. Fla. 1999); *Serrato*, 214 B.R. at 232.  Only this sum can restore

-44-

the bankruptcy estate's "financial condition to the state it would have been had the transfer not occurred." *Serrato*, 214 B.R. at 232 (quoting *Reiber v. Baker (In re Baker)*, 17 B.R. 392, 395 (Bankr. W.D.N.Y. 1982)).

The parties did not specifically address the recovery issue at trial. Consequently, unless they can agree on the current value of the lake home and how Beverly Porter will pay the bankruptcy estate for its one-half interest in it, Trustee Allred will need to sell the lake home under 11 U.S.C. § 363.[38]

An appropriate order and judgment shall be entered.

Dated: March 13, 2009.

BY THE COURT:

Charles L. Nail, Jr.
Bankruptcy Judge

NOTICE OF ENTRY
Under Fed.R.Bankr.P. 9022(a)

This order/judgment was entered
on the date shown above.

Frederick M. Entwistle
Clerk, U.S. Bankruptcy Court
District of South Dakota

---

[38]  This probably is one of the few times when a homestead exemption claim will not come into play although a house is the subject asset.  Debtor James Porter declared no homestead exemption, and Beverly Porter is a self-declared Florida resident with a home there.